**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| ROLAND QUINTANILLA, *et al.,* | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-04-1965 |
| | § | |
| A&R DEMOLITION, INC., *et al.,* | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND ORDER**

In this suit, Rolando Quintanilla and twenty-one other named plaintiffs who worked

at two construction sites in Houston, Texas as employees of one of the subcontractors, A&R

Demolition, Inc. (A&R), allege violations of the Fair Labor Standards Act (FLSA), 29 U.S.C.

§ 201 *et seq.*  Plaintiffs filed a motion to certify a class of similarly-situated nonexempt

employees of A&R under 29 U.S.C. § 216(b) and a motion for leave to file a second

amended collective action complaint to clarify the allegations as to the putative class.

(Docket Entry Nos. 25, 43.)  In addition to suing A&R, plaintiffs also sued the general

contractors that hired A&R to perform work on the two construction projects, Swinerton

Builders (Swinerton) and Satterfield & Pontikes (Satterfield).  As to A&R, plaintiffs alleged

that it failed to pay overtime as required under the FLSA by paying for only some of the

hours worked, inaccurately recording the number of hours worked, and not paying overtime

rates when employees worked more than forty hours in a single work week; did not pay the

hourly rates required; and retaliated against workers who complained about these violations. As to the two general contractor defendants, plaintiffs alleged that they are liable under the FLSA because they acted as employers or in the interest of an employer with respect to the putative class members.

The two general contractor defendants, Swinerton and Satterfield, oppose class certification and move for summary judgment to dismiss them from this lawsuit. These defendants argue that they lacked the control necessary to be held liable to A&R's employees under the FLSA. (Docket Entry Nos. 49, 50.)  A&R opposes the certification of the class proposed by plaintiffs.

Based on a careful review of the pleadings, the motion, response and reply, the present record, and applicable law, this court grants plaintiffs' motion for leave to file the second amended collective action complaint; grants the motions filed by Swinerton and Satterfield for summary judgment; and grants plaintiffs' motion for conditional class certification against A&R, the issuance of notice, and related discovery.  The reasons are set out in detail below.

## I.     Background

### A.     The Parties

A&R performs demolition and asbestos removal work on construction sites.  Plaintiffs allege that Raymond and Adriene Reveile own A&R Demolition, Inc., Allstate Services, and Allstate Environmental.  (Docket Entry No. 32, p. 15–16.)  According to plaintiffs, Allstate Services is the "asbestos abatement arm" of A&R, and A&R and Allstate Services are the

same entity.  Two separate general contractors hired A&R as a subcontractor to perform asbestos removal and demolition work on two different projects in Houston, Texas. Defendant Swinerton hired A&R to perform asbestos removal work on the Texas State Hotel, a renovation project that began in February 2003 and ended in June 2004.  Defendant Satterfield, hired by Harris County as general contractor, hired A&R to perform demolition work on the Harris County Juvenile Justice Center ("JJC") project, which began in September 2003 and ended in January 2004.[1]  Swinerton was not associated with the JJC project and Satterfield was not associated with the Texas State Hotel project.

According to the proposed second amended complaint, plaintiffs are current and former nonexempt employees who worked full-time for A&R on its construction and demolition sites in Texas from January 2001 to the present, performing manual labor.  Plaintiffs seek to certify a collective action on behalf of these individuals who were not paid overtime for hours worked in excess of forty hours in a work week and who experienced improper pay deductions, such as deductions for equipment that was damaged or required repair, regardless of fault.  The original complaint briefly referred to A&R's construction and demolition sites throughout Texas, but focused on the JJC project in which Satterfield was the general contractor and the Texas State Hotel project in which Swinerton was the general contractor.

---

[1]  Wages for work performed on the JJC project, a public works project, were set by Harris County. Texas law requires that all workers employed on a public works project receive prevailing wages as set by the entity that awards the contract.  TEX. GOV. CODE § 2258.023.  The prevailing wage rate depends on the type of work being performed and applies whether the worker is employed by the general contractor or a subcontractor.  (Docket Entry No. 27, Ex. A.)  In support of unlawful pay practices that occurred at the JJC project, plaintiffs alleged and submitted affidavits stating that they were not paid the prevailing wage rates.

Plaintiffs alleged that although A&R directed their activities at all the construction sites, in the JJC and the Texas State Hotel sites, the respective general contractors exercised sufficient control over the A&R workers to be liable under the FLSA and to be proper defendants in the collective action.

### B.  Plaintiffs' Allegations, Motion for Certification, and Affidavits

Plaintiffs filed this suit in May 2004.  In February 2005, plaintiffs filed a motion to certify a class of similarly-situated hourly wage nonexempt workers hired by A&R who did not receive overtime compensation when they worked more than forty hours in a work week. Plaintiffs alleged that they routinely worked  "anywhere from 70-100 hours per week performing hard manual labor" without overtime compensation.  (Docket Entry No. 25, ¶ 13.) In addition, plaintiffs alleged that they were "routinely" subjected to improper pay deductions that reduced their salaries to an amount below minimum wage.  These deductions were for equipment that was damaged, lost, or required repair, even if the damage or loss occurred outside plaintiffs' work shifts, "regardless of fault or any individual responsibility."  (*Id.* ¶ 14.)  Plaintiffs also alleged that defendants delayed or avoided paying wages by tactics such as requiring workers to wait hours before the checks were delivered or paying only partial checks on scheduled paydays; failing to keep accurate records of hours worked or falsifying those records; withholding paychecks until the employee signed a release; and on the JJC project failing to pay employees the prevailing wage rate the County set.[2]

---

[2]  On December 30, 2003 a notice of the complaints and request for a response was sent to A&R.  On January 6, 2004, the Director of the Contract Compliance Office recommended that, due to A&R's failure to respond, the Commissioners' Court "make an initial determination to find that good cause exists that a

Plaintiffs did not include the allegations of failure to pay minimum wage or retaliation in the motion for certification.  Plaintiffs sought certification of a class defined as "all current and former non-exempt hourly wage employees of A&R Demolition, Inc., Allstate Services, Ltd., Satterfield and Pontikes Construction, Inc., Swinerton Builders, Raymond L. Reveile L.L.C., Raymond L. Reveile, and Andrea C. Reveile who did not receive overtime wages," and whose claims were within the applicable limitations period.  (Docket Entry No. 25, ¶ 5.) In plaintiffs' first amended collective action complaint, the class is described as nonexempt employees, who "(1) did not receive overtime wages, and/or (2) were subject to impermissible pay deductions."  (Docket Entry No. 21, ¶ 27.)

Plaintiffs filed two affidavits in support of the motion to certify.  One affidavit was from Rolando Quintanilla, who worked full-time for A&R from July 2003 to December 2003

---

violation to pay Harris County Prevailing Wage Rates has occurred" for which Satterfield would be held liable as general contractor.  (Docket Entry No. 25, Ex. F.)  The recommendation was approved.  On January 15, 2004, Bud Miller, a contract compliance officer for Harris County, sent a letter to Satterfield that stated in part:

> We have received wage rate complaints from fifty-one workers from the end of December 2003 to 12 January 2004 concerning alleged violations of Texas Government Code 2258.023 by A&R Demolition, a subcontractor for [Satterfield].
> . . .
>
> [A] contractor who violates section 2258.023 as set forth in the contract between Harris County and [Satterfield] must pay the prescribed penalty [of sixty dollars a day] for each worker employed for each calendar day or part of a day that the worker is paid less than the wage rates stipulated in the contract, even if the underpaid worker agreed to accept a wage below what is listed.

(Docket Entry No. 25, Ex. E.)  The letter contained a list of the fifty-one affected workers and the amount owed to each for a total amount of $21,877.85 (including $9,758.00 in penalties).  Plaintiffs allege that they never received the backpay amounts set out in Miller's January 2004 letter.

and was assigned to work at the JJC and the Texas Hotel worksites.  Quintanilla stated in his affidavit that he worked  as a "safety coordinator" and, like his coworkers, was required to work more than forty hours a week without overtime compensation. He described defendants' practice of unpaid overtime and improper pay deductions, as follows:

> I earned between $7.00 and $9.50 per hour during my employment with A & R. However, A & R frequently attempted to avoid paying me my wages.  I often received only a partial paycheck that did not fully compensate me for the hours I had worked.  I routinely worked approximately 70-75 hours per week. I was not paid overtime wages.  I have never received my last paycheck.  My co-workers were also treated in a similar manner by A & R.
>
> . . .
>
> A & R assigned me a truck to provide transportation to some of the other workers.  I was involved in an [accident] while driving the company truck.  The brakes failed and I hit a stop sign.  A & R docked my pay in the amount of $1,500 for the repairs.  I was required to sign an agreement that I authorized the deduction or I would be terminated.
>
> I was also docked along with some of my co-workers for missing tools during my employment with A & R.  The tools we were required to pay for were apparently stolen over a holiday weekend when we were not present at the worksites.  It was my understanding that a supervisor. . . failed to lock up the tools over the weekend.  Regardless, I was required to pay for these missing tools and was docked approximately $100.00.

(Docket Entry No. 25, Ex. B, ¶¶ 3, 5–6.)

Quintanilla also described the relationship of Satterfield and Swinerton to A&R workers at the two job sites.  His affidavit stated:

> Michael Shane, an A & R employee, was my supervisor. However, supervisors employed by Swinerton Builders, the general contractor on the Texas State Hotel project, also gave me instructions regarding my work. I frequently complained to the Swinerton supervisors concerning A&R's failure to pay me [overtime] wages. Supervisors employed by [Satterfield] were also aware of A&R's failure to pay its employees their full wages. However, Swinerton Builders and [Satterfield] did nothing to correct the situation.

(Docket Entry No. 25, Ex. B, ¶ 4.)

The second affidavit was filed by Bud Miller, a Harris County employee familiar with the prevailing wage violations reported for work performed under the Satterfield subcontract on the JJC project. In his affidavit, Miller described A&R's compensation practices as follows:

> Through my dealings with A & R on this project, I have seen that A & R engages in tactics that appear to be designed to avoid paying its employees. Often A & R employees are provided only partial checks that do not compensate them for the hours of work they have performed. Additionally, A & R employees routinely work more than 40 hours per week at the worksite, but are not paid overtime wages. I also noticed that A & R employee timesheets appeared to be all in the same handwriting. The workers were permitted to write their names, but the supervisors apparently wrote down the times that they arrived and left the worksite. All the arrival and departure times were the same. Based on my observations, this information was not accurate.[3]

---

[3] Defendants objected to this paragraph of Miller's affidavit on the basis of lack of personal knowledge. Because the last sentence refers to "observations," defendants argue that it should not should not be considered as part of the record supporting certification of a collection action for unpaid overtime. Miller stated that he dealt with A&R on this project after the County had received complaints about A&R's practices in paying its workers. Miller has shown a sufficient basis for the statements he makes. In his affidavit Miller described alleged compensation practices of A&R at the Juvenile Justice Center Project only. Defendants argue that Miller's affidavit is probative of whether defendants complied with the prevailing wages required on public jobs under TEX. GOV. CODE § 2258.023, but is not competent evidence of plaintiffs' claims for unpaid overtime in violation of the FLSA. The record shows that Miller was familiar with the timesheets of

Employees of A & R must typically wait for many hours after their shifts to receive their paychecks.  A & R employees asked me to remain at the worksite on January 8, 2004 because they knew that if I left, A & R supervisors would not arrive to deliver their checks.  If an employee could not wait and had to leave, A & R supervisors would take his paycheck back to Austin, Texas.  The worker would then be required to go to Austin to get their check.  Many workers were indigent and dependent upon A & R for transportation to and from the worksite.  I have been told that some of the A & R employees were threatened that if they spoke to me about their wages, they would be left at the job site.

A & R also attempted on January 8, 2004 to have its employees sign a release in order to receive their paychecks.  A & R would refuse to pay employees who did not comply.  I had Tina Solis explain in English or Spanish to each worker that they did not have to sign the release as they picked up their checks.

(Docket Entry No. 25, Ex. A, ¶¶ 4–6.)

Plaintiffs asked this court to certify a collective action of  "all current and former non-exempt hourly wage employees of A & R Demolition, Inc., Allstate Services Ltd., Satterfield and Pontikes Construction, Inc., Swinerton Builders, Raymond L. Reveile L.L.C., Raymond L. Reveile, and Andrea C. Reveile who did not receive overtime wages."  (Docket Entry No. 25, ¶ 5.)  Plaintiffs argued that the proposed class is made up of similarly-situated employees because they are all "non-exempt hourly wage employees [who] performed similar duties – that of common laborers."  (Docket Entry No. 25, ¶ 24.)

---

at least fifty-one A&R employees who complained about their wages.  In his affidavit, he described timesheets that appeared to be prepared by a supervisor and showed all the same arrival and departure times. (Docket Entry No.25, Ex. A, ¶ 4.)  Miller also testified the nature and extent of his familiarity with the job site and A&R's work, including the fact that the employees were dependent on A&R for transportation to and from the job site.  The objection is overruled.

Defendants objected to the certification of the proposed class. Swinerton and Satterfield asserted that they were not subject to liability to A&R's workers under the FLSA. All defendants protested that the proposed class was not limited to employees who worked at the Texas State Hotel and JJC projects, but included employees who worked at other A&R demolition and construction sites in Texas; that the proposed class was not limited to the period of the two projects—February 2003 to June 2004—but was to proceed from January 2001 to the present; and that the proposed class was not limited to workers who performed manual labor at construction and demolition sites.[4] In response, plaintiffs urged that while they had focused on the two Harris County job sites, they had included other A&R job sites in Texas throughout this litigation and had not intended to confine the class to manual laborers who worked from February 2003 to June 2004. On July 17, 2005, plaintiffs moved for leave to file a second amended complaint to clarify the inclusion of "other job sites" and that the proposed class should include all similarly-situated workers for A&R regardless of "job title." Plaintiffs also sought leave to amend their complaint to include a claim A&R failed to maintain employment records as required under 29 U.S.C. § 516.2. All defendants object to the proposed amended complaint as an untimely effort to expand the class.

---

[4] On October 19, 2004, the A&R defendants objected to plaintiffs' discovery requests seeking documents outside the two job sites "that form the basis for the allegations contained in Plaintiffs' complaint." During a May 5, 2005 discovery hearing, prompted by the scope of plaintiffs' discovery requests, this court ordered A&R to produce employment records that would reflect the hours worked by plaintiffs at all job sites for the time period that the work was performed on the JJC and Texas State Hotel projects. (Docket Entry Nos. 37, 44.)

In the first amended collective action complaint and motion to certify, plaintiffs generally alleged that the pattern or practice of failing to pay overtime wages existed not only at the JJC and Texas State Hotel projects, but at other A&R demolition and construction job sites throughout Texas.  Although they claimed that "defendants' other prior and current employees are/were subjected to the wrongful practices and procedures," plaintiffs did not identify particular job sites.  The first amended collective action complaint stated:

> Many of these employees have worked with Plaintiffs and have reported that they too were not paid for hours in excess of forty, and also experienced improper pay deductions.  Thus, from discussions with these employees, Plaintiffs are aware that the illegal practices or policies of Defendants have been imposed on other employees not only at the Texas Juvenile Justice Center and Texas State Hotel Construction sites, but at other construction or demolition sites throughout Texas as well.

(Docket Entry No. 21, ¶ 46.)  The motion to certify referred to construction job sites throughout the state of Texas and in other states.  (Docket Entry No. 25, ¶ 21.)  In the motion for leave to file the proposed second amended complaint, plaintiffs identified other specific job sites in Texas, emphasizing that they were sites on which plaintiffs who had worked on the Texas State Hotel and JJC sites also worked.  The other job sites included:  "a project in Friendswood"; "another project in Friendswood"; "a job site in Livingston, Texas"; and projects for the Houston Intercontinental Airport, the Texas A&M University Research Farm in Amarillo, Texas, and Texas State University in San Marcos, Texas.  (Docket Entry No. 43, ¶ 2.)  Plaintiff Phillip Myers filed an affidavit in support of the proposed second amended complaint.  The affidavit stated in part as follows:

I worked for A & R Demolition and Allstate Services Ltd. from January 2003 through May 2004.  I was assigned to work at the Harris County Juvenile Justice Center project . . . I also worked on the Texas State Hotel project . . . .

My hourly wage fluctuated during my employment with A & R and Allstate.  I earned between $7.00 and approximately $16.00 per hour.  I performed [asbestos abatement work and demolition work].

A & R frequently attempted to avoid paying me my wages.  I often received only a partial paycheck that did not fully compensate me for the hours I had worked.  I routinely worked well over 40 hours in a single work week.  However, I was not paid overtime wages.  I was also not paid the prevailing wage rates for my work at the [JJC] project . . . .  My coworkers also did not receive overtime wages, the required prevailing wage rates, and were not paid for hours that they worked.

. . .

I also worked on other projects throughout Texas while employed with A & R and Allstate. I worked for A & R and Allstate at a construction site in San Marcos, Texas at  Texas State University.  I also worked for A & R and Allstate in Amarillo, Texas at the Texas A & M University Research Farm.  A & R and Allstate continued their illegal pay practices at these work sites as well.  I was not paid overtime while working at these job sites even though I worked in excess of 40 hours in a single work week.  My co-workers who were also employed with A & R and Allstate and worked more than 40 hours per week did not receive overtime wages while working at these job sites as well.

(Docket Entry No. 45, Ex. B).

　　　　To the extent that defendants' opposition to the proposed second amended complaint relies on unfair surprise or prejudice as a result of including work sites other than the two in Harris County, Texas and a claim for failure to keep accurate records, the argument is

unpersuasive.  Plaintiffs included allegations about other A&R work sites in the first amended collective action complaint and in the motion to certify the class.   Plaintiffs alleged as part of their complaint that A&R had failed to keep accurate time records reflecting hours worked or falsified those records.[5]   The need for additional discovery can be accommodated by changes to the scheduling order, which will be required in any event by the ruling on the certification motion.  The motion for leave to file the second amended complaint to include other job sites in Texas and a claim regarding A&R's failure to maintain required records is granted.

The substantive issues before this court fall into two general categories.  The first is whether Satterfield and Swinerton, the general contractors on the two Harris County projects that were the focus of this case, are subject to FLSA liability.  The second is the scope of the proposed class.  Both issues are addressed below.

## II.    The General Contractors' Status as "Employers" under the FLSA

### A.    The Applicable Legal Standard

Section 207(a) of the FLSA requires covered employers to compensate nonexempt employees at overtime rates for time worked in excess of statutorily-defined maximum hours. 29 U.S.C. § 207(a).  The FLSA defines an "employer," in part, as "any person acting directly or indirectly in the interest of the employer."  29 U.S.C. § 203(d) ("Employer includes any person acting directly or indirectly in the interest of any employer in relation to an employee

---

[5]  "Defendants likewise fail or failed to keep proper time records reflecting the hours worked by their non-exempt employees, or alternatively, falsify or falsified those time records and payroll records."  (Docket Entry No. 25, ¶ 16.)

and includes a public agency, but does not include any labor organization . . . .").  Whether an entity is an employer for the purpose of the FLSA turns on the "economic reality" of the working relationship.  *Goldberg v. Whitaker House Co-Op., Inc*., 366 U.S. 28, 33 (1961). The determination of an employment relationship "does not depend on . . . isolated factors but rather upon the circumstances of the whole activity." *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730 (1947).  The Fifth Circuit has held that the FLSA's definition of "employer" is "sufficiently broad to encompass an individual who, though lacking a possessory interest in the 'employer' corporation, effectively dominates its administration or otherwise acts, or has the power to act, on behalf of the corporation vis-a-vis its employees." *Reich v. Circle C. Invs., Inc.*, 998 F.2d 324, 329 (5th Cir. 1993) (*quoting Donovan v. Sabine Irrigation Co., Inc.*, 695 F.2d 190, 194–95 (5th Cir. 1983)).  The term "employer" under the FLSA "includes individuals with managerial responsibilities and 'substantial control over the terms and conditions of the [employee's] work.'"  *Lee v. Coahoma County*, 937 F.2d 220, 226 (5th Cir. 1991) (*quoting Falk v. Brennan,* 414 U.S. 190, 195 (1973); *see also Donovan v. Grim Hotel Co.*, 747 F.2d 966, 972 (5th Cir.1984) (observing that an individual qualifies as an employer if he "independently exercised control over the work situation"); *Welch v. Laney,* 57 F.3d 1004, 1011 (11th Cir.1995).

The FLSA's definition of "employer" contemplates the possibility of multiple employers.  A single individual may be the employee of two or more employers at the same time.  The Department of Labor regulations state that a joint employment relationship exists when there is an arrangement between employers to share an employee's services; one

employer is acting directly or indirectly in the interest of the other employer or employers in relation to the employee; the employers are associated with one another, directly or indirectly, with respect to the employment of the employee because one employer controls, is controlled by, or is under common control with the other employer.  29 C.F.R. § 791.2(b).  The DOL regulations also state that whether a joint employment relationship exists for the purpose of FLSA liability depends on the facts:

> A determination of whether the employment by the employers is to be considered joint employment or separate and distinct employment for purposes of the act depends upon all the facts in the particular case.  If all the relevant facts establish that two or more employers are acting entirely independently of each other and are completely disassociated with respect to the employment of a particular employee, who during the same workweek performs work for more than one employer, each employer may disregard all work performed by the employee for the other employer (or employers) in determining his own responsibilities under the Act.

29 C.F.R. § 791.2(a).

The case law also makes clear that no one factor is determinative in determining whether a defendant is an "employer" under the FLSA.  *See Watson v. Graves*, 909 F.2d 1549, 1553 (5th Cir. 1990) (discussing multifactored "economic reality" test).  In *Welch v. Laney*, 57 F.3d 1004, 1010–11 (11th Cir. 1995), the court, relying on *Wirtz v. Lone Star Steel Co.*, 405 F.2d 668, 669 (5th Cir. 1968), analyzed "the total employment situation" to determine a defendant's purported employer status under the FLSA.  In *Zheng v. Liberty Apparel Co.*, 355 F.3d 61, 72 (2d Cir. 2003), the Second Circuit held that the joint employer test requires a district court to look beyond the right to control.  The court set out a six-factor test relying on

the Supreme Court's decision in *Rutherford Ford Corp. v. McComb*, 331 U.S. 722 (1947).

The factors include:

    1.    whether the purported employer's premises and equipment were used;

    2.    whether liability could shift as a unit from one putative employer to another;

    3.    the extent to which the plaintiff performed a discrete line-job that was integral to the purported employer's business;

    4.    whether responsibility under the contract could pass from one subcontractor to another without material changes;

    5.    the degree to which the purported employer supervised the plaintiffs' work; and

    6.    whether plaintiffs worked exclusively or predominately for the purported employer.

*Zheng*, 355 F.3d at 72.

## B.    The General Contractors' Relationship to the A&R Workers

Plaintiffs acknowledge that A&R directed their work at the construction and demolition sites, but assert that Swinerton and Satterfield also directed and controlled the details of their work activities so as to be "employers" or "joint employers" under the FLSA. Plaintiffs emphasize that the FLSA defines "employer" as "any person acting . . . *indirectly* in the interest of an employer," 29 U.S.C. § 203(d) (emphasis added), and recognizes that a worker may have two employers. Both general contractor defendants have moved for summary judgment that they are not employers or joint employers under the FLSA in relation to the plaintiffs, who performed work under the A&R subcontracts. Both plaintiffs and the

general contractors have submitted affidavits and other evidence to show the degree and nature of the general contractors' authority over the A&R workers.

### 1.    Satterfield and the JJC Project [6]

Satterfield was the general contractor hired by Harris County to complete the Juvenile Justice Center project.  As general contractor, Satterfield entered into a subcontract with A&R Demolition on September 15, 2003 to perform demolition work.  The JJC project subcontract called for a lump-sum payment at the end of a calendar month for the work performed during that month.  (Docket Entry No. 27, Ex. A-1, p. 5–6.)  A&R was responsible for the payment of all labor and materials and was required to have a representative present on the job site to supervise its employees.  (*Id.,* p. 2.)  In January 2004, Harris County, the "owner" of the construction site, informed Satterfield that A&R had failed to pay its workers the prevailing wage rate for public works.  (Docket Entry No. 27, Ex. 2.)  Satterfield terminated its subcontract with A&R on January 30, 2004.

Satterfield does not have an ownership interest in A&R and does not control its day-to-day operations.  Under the subcontract, A&R was responsible for providing all labor and materials required to perform the work.  Harris County established the prevailing wage rates that would apply to all workers on the JJC project.  Satterfield asserts that it did not hire and fire any A&R employees and did not issue payroll checks or maintain employment

---

[6] Satterfield has submitted affidavits of Peter Lozado, the vice-president of Satterfield, and Wayde Troxler, the superintended for Satterfield on the JJC project.  (Docket Entry No. 49, Exs. A–B.)  Plaintiffs submitted affidavits of Quintanilla, Phillip Myers, and Selwyn McMorris, A&R employees who worked on the JJC project.  (Docket Entry No. 57, Exs. A–C.)

records for A&R employees.  Plaintiffs do not dispute that A&R issued payroll checks to all of the putative class members.

Satterfield assigned an on-site superintendent to monitor work progress. The subcontract required A&R to have a supervisory representative on the job-site during working hours. A&R designated several different superintendents/foremen who filled the job-site supervisor requirement during the five-month period that A&R had the JJC subcontract. Quintanilla identified Michael Henderson, an A&R employee, as his supervisor.  (Docket Entry No. 57, Ex. A.)

The deposition testimony and affidavits in the record show that while Satterfield personnel overseeing the project would directly communicate with and instruct A&R employees on safety practices and problems, the details of their work and schedules were not controlled or directly supervised by Satterfield.  (Docket Entry No. 49, Ex. B (Troxler Affid.)).  Wayde Troxler, a superintendent for Satterfield—who previously worked for Swinerton—described the general contractor's superintendent's job duties as scheduling, compliance, and safety.  "A general contractor makes sure the job is getting built according to the plans and specifications, schedule and safety."  (Docket Entry No. 56, Ex. K, p. 11.) Troxler testified that he walked the Hotel job site to "make sure the work is being done properly."  (*Id.* at 14.)  If there was a safety issue, the work was stopped.  If there was a compliance issue, he contacted the subcontractor's foreman.  (*Id.* at 15.)  "We didn't direct them.  We always dealt with foremans, other than safety issues."  (*Id.*)

Melton Davlin, an A&R employee, stated in his deposition that a general contractor's superintendent had the right to correct safety violations or perceived safety violations at the job sites "if done so through [] his counterpart at A&R but not to go directly and direct the laborers." (Docket Entry No. 45, Ex. 5, p. 153.)  Satterfield requested that A&R remove Michael Shane Henderson from the job site because of his poor performance record on safety issues.  Henderson, who was fired as an A&R superintendent at the request of Swinerton (for his work on the Texas State Hotel project) and Satterfield (for his work on the JJC project), stated in an affidavit that Troxler "routinely instructed me and A&R and/or Allstate's laborers concerning the means and methods of performing the work," but did not distinguish safety from compliance issues.  (Docket Entry No. 45, Ex. 3.)

   2.    *Swinerton Builders*[7]

A&R and Swinerton Builders entered into a Subcontract Agreement for Demolition and Abatement on February 20, 2003, for a lump-sum payment of $1,000,837.00.   (Docket Entry No. 50, Ex. A.)  There were four or five other subcontractors working at the Hotel job site at the same time that A&R was performing the abatement and demolition work.  (Docket Entry No. 50, Ex. C, ¶ 7.)  Bert Collins, a Senior Project Manager for Swinerton, stated in his affidavit that the "arrangement between A&R and Swinerton on the Hotel project was a run-of-the mill contractor/general subcontractor arrangement."  (*Id.* ¶ 8.)

---

   [7] Swinerton attached as exhibits to its motion its contract with A&R Demolition for the Texas State Hotel project; excerpts from the deposition of Raymond L. Reveile; affidavits of Bert Collins, senior project manager for Swinerton who worked on the Hotel project, and Donna Stafford, who worked in Swinerton's payroll department, and excerpts from the deposition of Melton Davlin.  (Docket Entry No. 50.)

The parties executed Swinerton's standard subcontract form, which extensively covered issues of safety, clean-up, schedules, insurance, indemnification, claims and disputes, and use of equipment.  The subcontract stated in part:

> SCHEDULE
>
> Time is of the essence of this Agreement.  Subcontractor shall provide Contractor with scheduling information and a proposed schedule for performance of its work in form and by date acceptable to Contractor.   Subcontractor shall conform to Contractor's progress schedule and all revisions or changes made thereto.
> . . .
>
> Subcontractor agrees to submit on a weekly basis, and at the time of the submission of progress payment requests, a report, in a form satisfactory to Contractor, itemizing on a weekly basis actual quantities of work performed and, on a daily basis, manpower and equipment employed by Subcontractor on the project.
>
> SAFETY
>
> Subcontractor shall comply fully with all laws . . . with respect to occupational health and safety, the handling and storage of hazardous materials, accident prevention, safety equipment and practices . . . .   Subcontractor shall conduct inspections to determine that safe working conditions and equipment exist and accepts sole responsibility for providing a safe place to work for its employees . . . .
>
> . . .
>
> Subcontractor agrees that it is Subcontractor's sole responsibility to employ labor in according with all applicable safety codes, including but not limited to State and Federal Safety Codes, and under conditions satisfactory to Contractor.

LABOR RELATIONS AND SUBCONTRACTOR
EMPLOYEES

> Subcontractor shall employ only competent, well-disciplined
> workers to perform the Work hereunder and Subcontractor agrees
> to immediately remove and replace any employee(s), including
> Subcontractor's superintendent, whom Contractor, Owner, or
> Architect deems unsatisfactory.

(Docket Entry No. 50, Ex. A, pp. 0004–05, 00008, 00011.)  The subcontract required A&R
to include in the work plan "an organizational chart identifying the site supervisory personnel.
. . ."  (*Id.*, p. 00031.)

The evidence in the record showed that Swinerton did not pay the A&R employees.
Donna Stafford, an employee in Swinerton's payroll department, compared the plaintiffs'
collective action complaint with Swinerton's payroll and employment records.  She stated that
one of the plaintiffs—Phillip Myers—also worked for Swinerton for a brief period, from
August 23, 2004 to September 5, 2004, and was paid for those dates.  (Docket Entry No. 50,
Ex. D.)  Swinerton did not maintain payroll or other records for the subcontractors'
employees.  Swinerton did not hire or fire the A&R employees, with the exception of asking
A&R to remove one superintendent, Michael Shane Henderson, from the project, because he
would leave the job site.  Collins testified that Swinerton did not supervise the details of the
A&R employees' jobs, except to require them to stop working when their A&R supervisor
was not present on the job site.  (Docket Entry No. 50, Ex. C.)

Plaintiffs argue that the deposition testimony of John Pruitt, a Swinerton employee, is
evidence that Swinerton controlled and supervised the A&R employees who worked at the

Texas State Hotel project.  Swinerton responds that the plaintiffs are confusing precautions that Swinerton took to ensure job safety with evidence of control.  (Docket No. 58 ¶ 2.)  The cited deposition testimony reads as follows:

> Q:    What other types of things would you see besides safety issues that you felt correcting with A&R Demolition people?
>
> A:    Method that they would use to do certain things, which – which really fell into a lot of safety issues.
>
> Q:    Now if they were using a method to do their job that you did not like, was there any doubt in your mind, Mr. Pruitt, that you could change that?
>
> A:    Yeah, I could change it, but I would get with the supervisor and we would discuss it.

(Docket Entry No. 57, Ex. G, p. 24.)  Swinerton points out that neither John Pruitt nor Bert Collins spoke Spanish, which precluded them from giving instruction directly to most of the A&R workers.  (Docket Entry No. 50, Ex. C, p. 2.)  As noted, Henderson, the A&R superintendent fired from both the Hotel and JJC projects, stated in his affidavit that "Swinerton supervisors and/or superintendents also directed me and the other A&R and/or Allstate laborers at the work site concerning the details of the work to be performed." (Docket Entry No. 45, Ex. 3, ¶ 6.)

### C.    Analysis

Plaintiffs' primary argument is that the general contractors exercised sufficient control over the way in which A&R employees worked to make the general contractors "joint" employers for the purpose of the FLSA.  Defendants respond that a general contractors'

supervision of a subcontractor's work on a short-term project is insufficient to create joint employer status for the purpose of the FLSA.  (Docket Entry No. 27, ¶ 18.)

In *Zheng*, the court emphasized that whether an entity is a joint employer must be based on the "circumstances of the whole activity," but identified factors that are "illuminating."  355 F.3d at 71–72 (*quoting Rutherford*, 331 U.S. at 730).  The court sought to identify when an entity has "functional control over workers even in the absence of []formal control. . . ."  *Id.* at 72.  In the context of subcontractor/general contractor relationships, however, the court recognized the necessity of care in applying the factors in a way that would "classify nearly all subcontracting relationships as joint employment relationships—a result that finds no support either in the law or in our country's commercial practices."  *Id.* at n.11.  The factor of the degree to which the defendants supervised the plaintiffs' work required particular care.  The court held that extensive supervision by a general contractor over the work of a plaintiff employed by a subcontractor "weighs in favor of joint employment only if it demonstrates  effective control of the terms and conditions of the plaintiff's employment.  *Id.* at 72 (citations omitted).  "By contrast, supervision with respect to contractual warranties of quality and time of delivery has no bearing on the joint employment inquiry, as such supervision is perfectly consistent with a typical, legitimate subcontracting arrangement."  *Id.*  Supervision consistent with the role of a general contractor is not relevant to the joint employment inquiry.  Similarly, in *Moreau v. Air France*, 343 F.3d 1179, 1189 (9th Cir. 2003), the court held that the general contractor's supervision of a

subcontractors' workers did not show joint employment when the instructions concerned the performance of the subcontract.

In the present case, the record shows that A&R worked on the Texas State Hotel and JJC job sites under contracts that were consistent with "typical, legitimate subcontracting arrangement[s]." *Zheng*, 355 F.3d at 75. The evidence in the record as to the allocation of supervision and related tasks between A&R on the one hand, and Swinerton or Satterfield on the other, is consistent with such a relationship. Indeed, part of the plaintiffs' complaint in this case is that the general contractors failed to intervene and exert control when plaintiffs complained about A&R's failure to comply with FLSA or other obligations. There is insufficient evidence to raise a fact issue as to whether Swinerton or Satterfield were joint employers with respect to the plaintiffs. Their motions for summary judgment are granted.

## III.    The Motion to Certify the Class as to the A&R Defendants

### A.    The Applicable Legal Standards

Section 216(b) creates a cause of action for employees against employers violating the overtime compensation requirements. 29 U.S.C. § 216(b). Section 216(b) provides:

> An action . . . may be maintained . . . by any one or more employees for and in behalf of himself or themselves and other employees similarly situated. No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought.

*Id.* Section 216(b) establishes an "opt-in" scheme under which plaintiffs must affirmatively notify the court of their intention to become parties to the suit. *See Mooney v. Aramco Servs.*

*Co.*, 54 F.3d 1207, 1212 (5th Cir. 1995). District courts have discretion in deciding whether to order notice to potential plaintiffs. *See Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 170–71 (1989); *Villatoro v. Kim Son Rest., L.P.*, 286 F. Supp. 2d 807, 809 (S.D. Tex. 2003).

Courts recognize two methods to determine whether to authorize notice to similarly-situated employees advising them of their right to join an FLSA collective action. *See Mooney*, 54 F.3d at 1213–15. These methods are the two-step *Lusardi* approach and the spurious class action *Shushan* approach. *See id.*; *Shushan v. Univ. of Colo. at Boulder*, 132 F.R.D. 263 (D. Colo. 1990); *Lusardi v. Xerox Corp.*, 118 F.R.D. 351 (D.N.J. 1987). In *Mooney,* the Fifth Circuit found it unnecessary to determine which method is most appropriate. However, "[i]t is clear that the two-step ad hoc approach is the preferred method for making the similarly situated analysis and that the similarly situated standard does not incorporate Rule 23 requirements." *Basco v. Wal-Mart Stores Inc.*, No. 00-3184, 2004 WL 1497709, at *4 (E.D. La. July 2, 2004); *see also LaChapelle v. Owens-Illinois, Inc.*, 513 F.2d 286, 288 (5th Cir. 1975) (finding a fundamental difference between Rule 23 class actions and FLSA collective actions); *Mielke v. Laidlaw Transit, Inc.*, 313 F. Supp. 2d 759, 762 (N.D. Ill. 2004) (stating that the majority of courts have employed or implicitly approved the two-step method).

"*Lusardi* and its progeny are remarkable in that they do not set out a definition of 'similarly situated,' but rather they define the requirement by virtue of the factors considered in the [two-stage] analysis." *Mooney*, 54 F.3d at 1213. The first step of analysis is the "notice stage" in which the district court decides whether to issue notice to potential class members.

*See id.* at 1213–1214.  The court's decision is usually based only on the pleadings and any affidavits that have been submitted.  *Id.*  "Because the court has minimal evidence, this determination is made using a fairly lenient standard, and typically results in 'conditional certification' of a representative class" where potential class members receive notice and the opportunity to opt-in.  *Id.* at 1214.  The lenient standard requires only substantial allegations that potential members "were together the victims of a single decision, policy, or plan . . . ." *Id.* at n.8 (citations omitted); *Theissen v. Gen. Elec. Cap. Corp.,* 267 F.3d 1095, 1102–03 (10th Cir. 2001) (defining notice stage as requiring "substantial allegations" that plaintiff and putative class member were the victims of a single policy).  A factual basis for the allegations is needed to satisfy this first step.  *See Hall v. Burk,* No. 301CV2487H, 2002 WL 413901, at *3 (N.D. Tex. Mar. 11, 2002) (*citing Haynes v. Singer Co., Inc.,* 696 F.2d 884, 887 (11th Cir. 1983) (stating that "[u]nsupported assertions of widespread violations are not sufficient to meet Plaintiff's burden"); *see also Hipp v. Liberty Nat'l Life Ins. Co.,* 252 F.3d 1208, 1217 (11th Cir. 2001) (plaintiffs have the burden of demonstrating a reasonable basis for crediting their assertion that the aggrieved similarly situated individuals exist in the class they propose). Courts require "some identifiable facts or legal nexus [that] bind the claims so that hearing the cases together promotes judicial efficiency."  *Barron v. Henry County Sch. Sys.,* 242 F. Supp. 2d 1096, 1103 (M.D. Ala. 2003); *Gjurovich v. Emmanuel's Marketplace, Inc.,* 282 F. Supp. 2d 91, 96–97 (S.D.N.Y. 2003) (plaintiff must allege a common policy or plan and establish a sufficient factual nexus between his situation and the situation of the proposed classed members) (citations omitted).

Although the "similarly situated" standard is lenient at the notice stage, general allegations that the defendant employer violated the FLSA are insufficient.  Even at the notice stage, "a showing that employees are 'similarly situated' entails more than just a matching of job responsibilities.  The requirement that proposed class members be 'similarly situated' to the named plaintiffs ensures that the collective action promotes the 'efficient resolution of common issues of law and fact arising from the same alleged discriminatory activity.'" *Hunter v. Sprint Corp.*, 346 F. Supp. 2d 113, 119 (D.D.C. 2004) (*quoting Hoffmann-La Roche,* 493 U.S. at 170); *Smith v. Tradesmen Int'l, Inc.*, 289 F. Supp. 2d 1369, 1371 (S.D. Fla. 2003) (stating that before authorizing notice, district court should determine whether there are other employees who wish to opt-in and "whether these employees are similarly situated with respect to their *job requirements* and *pay provisions*") (emphasis in original).   "A court may deny plaintiffs' right to proceed collectively if the action arises from circumstances purely personal to the plaintiff, and not from any generally applicable rule, policy, or practice." *England v. New Century Fin. Corp.*, 370 F. Supp. 2d 504, 507 (M.D. La. 2005); *see Barron*, 242 F. Supp. 2d at 1104 ("[T]he mere fact that violations occurred cannot be enough to establish similarity, as that would not ultimately be sufficient to establish a pattern and practice without a showing that the violations were more than sporadic occurrences.").

If a court conditionally certifies a class, the action proceeds as a collective action during discovery. *See Mooney*, 54 F.3d at 1214.  The second stage of inquiry typically occurs when discovery is largely complete and the defendant moves to "decertify" the conditionally-certified class. *See id.*; *Cameron-Grant v. Maxim Healthcare Servs.,* 347 F.3d 1240, 1243 n.2

(11th Cir. 2003).  At that point, the court makes a factual determination as to whether there are similarly-situated employees.  *Id.*  If the district court finds that the claimants are similarly situated, the collective action may proceed.  *See Mooney*, 54 F.3d at 1214.  If the court decertifies the class, the opt-in plaintiffs are dismissed without prejudice and the original plaintiffs proceed on their individual claims.  Generally, district courts consider three second-stage factors when determining whether putative plaintiffs are similarly situated: (1) whether they share similar factual and employment settings; (2) whether various affirmative defenses would have to be applied individually to each plaintiff; and (3) fairness and procedural concerns.  *Mielke*, 313 F. Supp. 2d at 762; *see Lusardi*, 118 F.R.D. at 359.

### B.    Analysis

Defendants object to the scope of the proposed class on three grounds.  First, it is not limited to employees who worked at the Texas State Hotel and JJC projects.  Second, it is not limited to the time periods of the two projects—February 2003 to June 2004.  Third, it is not limited to construction workers who performed manual labor.

### 1.    The Issue of which Job Sites are to be Included in the Class

At the notice stage, the question is whether plaintiffs have made substantial allegations of a common plan or policy that violated the FLSA.  In this case, plaintiffs assert that they have alleged and presented affidavits describing A&R policies and practices, common to different job sites, that denied plaintiffs overtime compensation.  These policies and practices included refusing to pay overtime for hours worked in excess of forty hours in a work week;

falsely or inaccurately recording the number of hours plaintiffs worked; paying only partial paychecks; and improperly deducting amounts from paychecks.

In *Clarke v. Convergys Customer Management Group, Inc*., 370 F. Supp. 2d 601 (S.D. Tex. 2004),  the court granted conditional certification of a class of telemarketer workers "(1) in a single job category (2) on a single floor (3) at a single facility . . . (4) who were all hourly, non-exempt employees.  Most importantly, all of the workers in the potential class are alleged to have been subjected to the same unlawful practices . . . and to have performed the same type of pre-and post-shift, off-the-clock tasks." *Id.* at 606.  In *Lawrence v. Philadelphia*, No. 03-4009,  2004 WL 945139 (E.D. Pa. 2004), the plaintiffs asserted overtime for regularly scheduled hours that they were not paid overtime for and also asserted an "off-the-clock" claim for unpaid work performed outside of their regularly scheduled hours.  The court allowed the plaintiffs to proceed with a collective action for the "regularly scheduled" work claim, but found that the plaintiffs had failed meet the similarly-situated requirement for the "off-the-clock" claim.  The court explained:

> [E]ach of the current Plaintiffs and potential opt-in plaintiffs, is classified as a "Fire Service Paramedic" and has the same general job description.  However, Plaintiffs work in different unit types, different platoons, different locations, and have different supervisors.  Unlike the Plaintiffs' first claim, alleging failure to pay overtime wages for scheduled hours worked in excess of [forty hours] in a single workweek, the "off-the-clock" claim does not involve regularly scheduled time that is worked by all members of the class.  Rather, each of the Plaintiffs may potentially claim that on any given day he or she arrived early or departed outside of their regularly scheduled hours and were not compensated for such.  The circumstances of those individual

>claims potentially vary too widely to conclude that in regard to
>their "off-the-clock" claim, the Plaintiffs are similarly situated.

*Id.* at *2; *see also Smith*, 289 F. Supp. 2d at 1371 (considering whether plaintiffs worked in the same geographic location and whether the alleged polices and practices were established in the "same manner by and by the same decision maker").

In *Sheffield v. Orius Corp.*, 211 F.R.D. 411 (D.Or. 2002), the plaintiffs sought notice for a proposed class of workers who had been employed by different subsidiaries and affiliates of the defendant, were paid under different compensation systems, held different job titles, and worked at nine different job sites. The court rejected the proposed class, which consisted of a "vast universe of potential members" when the plaintiffs had relied on affidavits and declarations that "represent[ed] a much smaller set of injured workers." *Id.* at 47. The court distinguished cases in which the plaintiffs alleged shared circumstances, defined by specific work required of the particular position held by the plaintiff and the putative class members or a specific practice enforced by a common supervisor. "In *Ballaris* all employees in the collective action had to perform the same preparatory work of changing clothes, and in *Thiebes* all the employees worked in the Oregon Wal-Mart stores [and were subjected to a specific scheme that applied to all hourly workers]." *Id.* Because of the dissimilarities in geography, work sites, and payment systems represented in the proposed class, the court denied the motion to certify a collective action for unpaid overtime.

In this case, the allegations and affidavits describe practices and policies that A&R followed at every construction and demolition job site of refusing to pay hourly, nonexempt

workers performing manual labor overtime rates for hours worked in excess of the statutory limit, including failing to pay overtime hours worked at the overtime rate and either inaccurately or falsely recording the number of hours worked on timesheets prepared by A&R.  *See, e.g.*, *Thiebes v. Wal-Mart Stores, Inc.*, No. 98-802-KI, 1999 WL 1081357 at *1 (D. Or. 1999) (class of former Wal-Mart workers who were paid on an hourly basis filed a suit for unpaid overtime and alleged that their time sheets had been altered conditionally certified for notice).  The allegations that A&R consistently applied these practices to workers performing similar duties at different construction and demolition sites provides the requisite factual nexus for certification, not limited to the JJC and Texas State Hotel projects.  Courts routinely certify cases in which plaintiffs allege and present affidavits or similar evidence showing that their employer followed a consistent practice or policy of refusing to pay overtime for working more than forty scheduled hours in a single workweek.  *See Johnson v. TGF Precision Haircutters, Inc.*, 319 F. Supp. 2d 753 (S.D. Tex. 2004); *Gjurovich*, 282 F. Supp. 2d at 96 (approving notice to current and former meat department employees who held same or similar position as plaintiff, were paid a fixed weekly salary, and may not have received overtime compensation if he or she worked in excess of forty hours a week).

The allegation of improper pay deductions, however, is too individualized to support collective treatment.  Quintanilla's own affidavit and the allegations in the second amended complaint make it clear that whether a pay deduction for a lost or damaged piece of equipment was proper depended on whether the employee was at fault for the loss or damage.  (Docket Entry No. 25, Ex. B.)  Because such determinations are highly individualized, they are not

suitable for collective treatment. *Holt v. Rite Aid Corp.*, 333 F. Supp. 2d 1265, 1275 (M.D. Ala. 2004) (denying collective action where individualized inquiries required would obviate "the economy of scale envisioned by the FLSA collective action procedure"); *Mike v. Safeco Ins. Co. of Am.*, 274 F. Supp. 2d 216, 220–21 (D.Conn. 2003) ("Because the proof in this case is specific to the individual, [the plaintiff] has not provided evidence of a common thread binding his proposed class of employees."); *Pfaahler v. Consultants for Architects, Inc.*, No. 99-6700, 2000 WL 198888, at *2 (N.D. Ill. February 8, 2000) (denying motion for collective action when "the court would be required to make a fact-intensive, individual determination as to the nature of each potential claimant's employment relationship with [defendant]").

       2.    *The Issue of Job Title*

Plaintiffs argue that the class certified should include all hourly nonexempt workers of A&R, including "torch cutters, carpenters, equipment operators, in asbestos abatement, and other occupations." Plaintiffs allege that Raymond Reveile frequently changed employees' job titles to avoid them paying higher rates. Plaintiffs contend that A&R "did not discriminate as to the particular occupation of these workers when failing to pay overtime wages" and assert that "[t]o limit the proposed class to common laborers" defeats the purposes of a collective action. (Docket Entry No. 32, ¶ 31.)

If the putative class is defined to include workers hired by A&R to perform manual labor at construction and demolition work sites, plaintiffs have met their burden for the purpose of notice. "[P]laintiffs need show only that their positions are similar, not identical, to the positions held by the putative class members." *Hipp*, 252 F.3d at 1217. During the

second stage analysis this court will determine if the workers' positions and the type of work performed in those positions raise individualized fact issues that make the claims unsuitable for collective actions.  *See Thiessen*, 267 F.3d at 1103 (10th Cir. 2001) (during the "second stage" analysis, a court reviews the disparate factual and employment settings of the individual); *Clarke*, 370 F. Supp. 2d at 604 (noting that issues related to the individualized nature of the work performed by the class members are appropriate for consideration during the second-stage analysis, and not during the initial "notice" stage).

    *3.*       *The Class Period*

    Plaintiffs seek certification for a class of "similarly situated" employees who worked for A&R at construction and demolition sites in Texas from January 2001 to the present.  The statute of limitations under the FLSA limits the class period.

    Defendants argue that any proposed class should exclude claims that accrued before May 14, 2002 because any such claims would be barred by the statute of limitations. Plaintiffs respond that equitable tolling applies.   A cause of action under the FLSA "may be commenced within two years after the cause of action accrued, and every such action shall be forever barred unless commenced within two years after the cause of action accrued, except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued."  29 U.S.C. § 255(a).  The Supreme Court has interpreted the term "willful" to mean "that the employer either knew or showed reckless disregard as to whether its conduct was prohibited by the statute." *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 128 (1988).

The limitations period is not tolled with respect to other potential plaintiffs unless and until they opt in to the case.[8]  Based on the statute of limitations, courts have recognized that class certification is appropriately limited to workers employed by the defendant up to three years before notice is approved by the court.  *See Bd. of County Comm'rs of Johnson County, Kansas*, No. 04-2598, 2005 WL 1799208, at *1 n.1 (D. Kan. 2005); *Songu-Mbriwa v. Davis Memorial Goodwill Indus.*, 144 F.R.D. 1, 2 (D.D.C. 1992) ("Until a plaintiff, even a named plaintiff, has filed a written consent, she has not joined in the class action, at least for statute of limitations purposes.").

Accordingly, the class period cannot begin earlier than May 14, 2001, and is not tolled for the potential plaintiffs.  None of the plaintiffs in this case worked for A&R after 2004.  There is no basis in the present record to extend the class period beyond that date.

## IV.   Conclusion

This court grants the motions filed by Swinerton and Satterfield for summary judgment and grants plaintiffs' motion for conditional certification of a class as to A&R.[9]  Counsel for plaintiffs and A&R are to confer and, no later than **September 16, 2005**, submit a proposed

---

[8]  *See, e.g.*, *In re Food Lion, Inc.*, 151 F.3d 1029, 1998 WL 322682, at *12–13 (4th Cir. June 4, 1998) (unpublished opinion) (holding the district court did not err by dismissing opt-in plaintiffs' claims which exceeded the limitations period when no consents were filed within the applicable three-year period); *Vaicaitiene v. Partners in Care, Inc.*, No. 04-9125, 2005 WL 1593053, at *7 (S.D.N.Y. July 6, 2005) (authorizing notice to those employed up to three years prior to the court's opinion "in the interest of reaching all similarly situated potential plaintiffs"); *Gjurovich*, 282 F. Supp. 2d at 104 ("only by 'opting in' will the statute of limitations on potential plaintiffs' claims be tolled"); *Hoffman v. Sbarro, Inc.*, 982 F. Supp. 249, 260 (S.D.N.Y. 1997) (same); *Hasken v. Louisville*, 234 F. Supp. 2d 688, 691 (W.D. Ken. 2002) ("[T]he statute of limitations [in an FLSA collective action case] continues to run as to each individual plaintiff until he or she files a written consent to become part of the action."); *Bonilla v. Las Vegas Cigar Co.*, 61 F. Supp. 2d 1129, 1132–33 (D. Nev. 1999).

[9]  The motion to expedite, Docket Entry No. 57, is moot.

form of notice.  A hearing will be held on **October 3, 2005 at 10:00 a.m.** to address issues relating to the notice, expedited discovery, and other aspects accompanying the pursuit of this collective action.

SIGNED on August 30, 2005, at Houston, Texas.

_____
Lee H. Rosenthal
United States District Judge